Hope A. Del Carlo, OSB No. 00241
Oregon Law Center
921 SW Washington St., Suite 516
Portland, OR 97205
Telephone: 503/473-8319
Facsimile: 503/295-0676
hdelcarlo@oregonlawcenter.org

Mark E. Griffin, OSB No. 76152
R. Bradley Griffin, OSB No. 07239
Griffin & McCandlish
215 SW Washington St., Suite 202
Portland, OR  97202
Telephone: (503) 224-2348
Facsimile:   (503) 224-3634
mark@markgriffin.com

Attorneys for Plaintiffs Justin James and Nicole James

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JUSTIN JAMES and NICOLE JAMES; | Case No. CV-08-0397-BR |
| Plaintiffs, | |
| v. | SECOND AMENDED COMPLAINT |
| FREMONT REORGANIZING COMPANY, fka FREMONT INVESTMENT & LOAN COMPANY, a California corporation; BRIDGE CAPITAL CORPORATION, a California corporation; HSBC BANK USA, NA, a national banking association, | Truth in Lending Act, Fraud, Oregon Mortgage Broker and Banker Statute, Real Estate Settlement Procedures Act, Negligence, Breach of Contract |
| Defendants. | DEMAND FOR JURY TRIAL |

INTRODUCTION:

1.

This is a consumer fraud case arising out of two refinanced home mortgages.

Justin and Nicole James ("Jameses") are a married couple who own two homes on the Oregon coast; a residence and a rental home.  In September 2006, the plaintiffs were convinced to refinance the mortgages on both properties by an employee of mortgage broker Bridge Capital Corporation ("Bridge"), despite the plaintiffs' initial request to only refinance their rental home.  The refinanced loans, made by Fremont Investment & Loan ("Fremont") were on much less favorable terms than their prior mortgages.  For example, the interest rate for the rental property jumped from a fixed 5.95% to an adjustable rate mortgage of 10.95% with a balloon payment of $165,400.00 at maturity.

Bridge convinced the plaintiffs to sign the paperwork for these loans by promising that it would refinance them at no charge into the best rate available after six months of repayment.  The later refinance never materialized.  Bridge charged approximately $25,000.00 in loan origination fees alone to arrange these transactions, along with a series of "junk fees" that increased the amount financed but failed to pay for any legitimate services.

Bridge and Fremont conspired to shift fees away from the Jameses' residence to their rental property in the hope of avoiding the disclosure and substantive requirements of the Home Ownership and Equity Protection Act ("HOEPA").  Such efforts should fail, and Fremont and Bridge should be held liable for not providing appropriate HOEPA disclosures and including an illegal pre-payment penalty.  Additionally, the plaintiffs were given inaccurate and confusing Truth in Lending Act disclosures that obscured the true cost of credit.  The plaintiffs also paid underwriting fees to Fremont to properly analyze their ability to repay the loans.  Fremont breached the standard of care for these underwriting services by failing to follow their own underwriting guidelines and ignoring inconsistencies in plaintiffs' loan applications.  Fremont had a duty to evaluate the net tangible benefit of these loans and the plaintiffs' ability to repay them.  As described below, these loans were deleterious to the Jameses' financial well-being and

had no chance of being repaid.  By approving and funding the loans, in spite of clear evidence that they offered the plaintiffs no financial benefit, and they had no capacity to repay them, Fremont's conduct was itself fraudulent.

Both loans were subsequently securitized through a pooling and servicing agreement which named HSBC Bank USA, NA, as trustee.  This lawsuit demands rescission of the plaintiffs' residential loan under the Truth in Lending Act, money damages, and other relief, including an injunction against foreclosure of the properties.

This Second Amended Complaint further clarifies the facts in this matter and adds additional claims, including new violations of the Truth in Lending Act, and its subsection, the Home Ownership and Equity Protection Act, Real Estate Settlement Procedures Act, breach of contract and negligence.

JURISDICTION

2.

This court has jurisdiction of the case by virtue of 15 USC § 1640(e) and 28 USC §§ 1331, 1337.

PARTIES

3.

The plaintiffs, Justin and Nicole James ("the Jameses"), are natural persons. They own a home at 4063 43rd St. NE, Neotsu, Oregon, which is and has been at all times material to this action their principal residence, and a rental property located at 2125 NE 21st, Lincoln City, Oregon.

4.

Defendant Fremont Reorganizing Corporation, formerly known as Fremont Investment & Loan ("Fremont"), is a California corporation.

5.

Defendant Bridge Capital Corporation, ("Bridge") is a California corporation, that was formerly or should have been licensed as an Oregon mortgage broker or banker under ORS 59.840, *et seq.*

6.

Defendant HSBC Bank USA, NA ("HSBC") is a federally-chartered national banking association.

7.

At all times relevant to this action, Fremont regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, making it a creditor under the Truth in Lending Act ("TILA"), 15 USC § 1602(f) and Regulation Z, 12 CFR § 226.2(a)(17).

8.

On information and belief, HSBC is the current holder of the plaintiffs' loans, as trustee for Fremont Home Loan Trust 2006-D Mortgage-Backed Certificates, 2006-D. As an assignee of the residential loan that is the subject of this action, HSBC is liable for the loan's rescission under the Truth in Lending Act ("TILA"), 15 USC § 1635, and Regulation Z, 12 CFR § 226.23.

FACTUAL ALLEGATIONS:

9.

The plaintiffs called Bridge in response to a flyer they received in the summer of 2006. The plaintiffs were looking for a lender to refinance only the loan on their rental property. By making false promises, Bridge convinced the plaintiffs to refinance both loans using Bridge's services. This had the effect of vastly increasing origination fees and hiding the true cost of credit to the Jameses without providing them with a net tangible benefit. Fremont was the originating lender for both loans, which are now in

default.  Non-judicial foreclosures of both loans were initiated by their holder prior to the filing of this lawsuit.

10.

Prior to the plaintiffs' involvement with Bridge, Bridge and Fremont had entered into an agreement by which Bridge would submit loans to Fremont for funding and approval.  In conjunction with this agreement, Bridge solicited the plaintiffs, completed loan applications on their behalf, collected supporting information from them, including credit reports and other information about their existing debts and income (such as the interest rates and principal balances of their existing mortgages), and submitted this information to Fremont for underwriting, approval, and funding in accord with Fremont's loan submission and underwriting guidelines.

11.

Bridge and Fremont intended to work together to make a profit through this agreement, which provided for the payment of fees to Bridge from borrowers' funds, through loan closings, as well as directly to Bridge from Fremont in the form of yield spread premiums.

12.

On information and belief, Bridge submitted the plaintiffs' loan application to Fremont and no other lenders.  At Fremont's instruction, Bridge acted as the sole conduit of information between the borrowers and Fremont about the loans.  In a letter, Fremont instructed the plaintiffs to ask Bridge any questions they had about "loan status or the information [Fremont has] provided."  Referenced within this letter were loan cost disclosures provided by Fremont. The letter also stated that if the borrower had "any questions which are not answered by these documents," that it should "contact [Bridge Capital Corporation's employee]."

13.

Under the terms of the agreement between Bridge and Fremont, Fremont ultimately had the authority to approve or reject plaintiffs' loan application. The plaintiffs paid Fremont $2058.00 in underwriting fees through the eventual closing of the loans. These fees were paid by the plaintiffs to Fremont with the expectation that Fremont would use its expertise as an institutional lender to make a reliable assessment of the affordability of the loans, and refuse to approve the application if its analysis showed that the loans were unaffordable for the plaintiffs. These facts and the circumstances surrounding plaintiffs' loan application with Fremont gave rise to a special relationship between the plaintiffs and Fremont.

14.

Between the time Bridge made its first broker demand to the final setting of fees, the interest rates, loan terms, yield spread premiums, principal loan amounts, origination fees and other fees were altered at least *twelve times* by Fremont or Bridge. The plaintiffs took no part in these negotiations. Upon information and belief, these alterations were an effort by Bridge and Fremont to evade the Home Ownership and Equity Protection Act ("HOEPA") by shifting fees away from the plaintiffs' residence to their rental home. This effort should fail, as when the yield spread premium is added back to the residence as was originally contemplated by Fremont and Bridge, the points and fees exceed 8% of the total loan amount.

15.

While shifting fees back and forth in an effort to evade HOEPA, Bridge added a series of junk fees to insure itself the maximum payoff, including duplicative credit reporting fees, a "loan setup fee," which was charged for only one loan and was added at the last minute to the final broker demand for the rental house, and a superfluous expedited appraisal fee.

16.

On or about September 15, 2006, a notary public came to the plaintiffs' home with loan documents from Bridge and Fremont.  Plaintiffs were told that they had to sign that very day or they would not be able to obtain the deal they had been promised.  September 15, 2006, was the plaintiffs' fifth wedding anniversary, and they were on their way out of town.  They felt rushed to quickly sign the documents.  While signing, plaintiffs noticed discrepancies in the loan paperwork that caused them concern.  Plaintiffs called Bridge and were told that the loans it was offering them were the best that they could qualify for at the time, and that after six months of on-time payments (which would improve the Jameses' credit rating)any irregularities in the loans would be corrected later, when the loans were refinanced again.  Bridge also informed plaintiffs that they had the right to cancel the loans within 72 hours of signing, and could always back out later, after they had a chance to read the documents carefully.

17.

When the plaintiffs returned from their anniversary trip, they called Bridge and attempted to cancel the loans.  Bridge's employee sent a letter confirming that  after six months, Bridge would refinance them at no charge into new 30-year, fixed-rate loans at "the lowest rate."

18.

Upon information and belief, the claim that plaintiffs received the best rate they could qualify for at the time was untrue, as the Jameses were penalized with an increased interest rate for unknowingly receiving a "stated income" loan.  The representations regarding the temporary nature of their new interest rates and the imminent refinance were made shortly after the plaintiffs had received a copy of a letter from Fremont telling them to direct all questions about the loans to Bridge.

19.

As described in the below chart, the two loans were substantively unconscionable on their face, as they vastly increased the plaintiffs' interest and principal without providing a net tangible benefit.

| Type of Loan | Mortgage on Residence | Mortgage on Rental Home | Home Equity Loan on Rental Home |
|---|---|---|---|
| Pre-refinance principal | $169,262 | $121,270.67 | $59,787 |
| Pre-refinance payments | $1501 | $1029 | $558 |
| Pre-refinance interest | 5.88% (fixed) | 5.95% (fixed) | 10.97% (adjustable) |
| Post-refinance Principal | $259,000 | $178,500 | 0 |
| Post-refinance payments. | $2140.12 | $1635.84 | 0 |
| Post-refinance Interest | 9.30% (adjustable) | 10.95% (adjustable) | 0 |

As can be seen from this chart, the plaintiffs' interest rates increased dramatically and were no longer fixed. Moreover, the total initial payments on the two loans increased by $687.96 and the principal of their loans went up by $87,180. These payments were set to go up after two years and were not amortizing (unlike their previous non-home equity loans). The plaintiffs received less than $22,000 in cash (plus the payment of small credit card bills) in exchange. Bridge instructed the plaintiffs to use these funds to make their mortgage payments until the promised refinance was to occur six months later.

20.

In the course of processing and underwriting the plaintiffs' loan, Bridge prepared numerous contradictory loan applications on plaintiffs' behalf that misrepresented the

plaintiffs' income.  This was done without plaintiffs' knowledge or consent, and plaintiffs provided Bridge with truthful information about and documentation of their actual income.  These applications were transmitted to Fremont prior to the loans' closing. The misrepresentations in plaintiffs' numerous loan applications are manifest when compared to the employment verification documentation requested by Fremont, including Mr. James's job title.

21.

Fremont committed to fund the plaintiffs' loans originated by Bridge prior to the loans' signing, and funding; Bridge acted as Fremont's agent during the phases of loan application, underwriting, closing, and funding the plaintiffs' loans by performing the tasks described in the foregoing paragraphs.

22.

Fremont set its own approval conditions for the plaintiffs' loans, participated in underwriting them, and performed an independent review of the plaintiffs' loan application and supporting documentation.  By approving and funding the loans, while failing to take note of the discrepancies in the income information provided by Bridge and the employment verification it obtained itself, by failing to underwrite in accord with its own debt to income standards, and by refusing the address the plaintiffs' concerns about the loans after they had closed, Fremont ratified Bridge's fraudulent conduct.

23.

Alternatively, Bridge was the actual or apparent agent of Fremont, because Fremont delegated the loan origination tasks described above to Bridge, and told the Jameses via a letter to direct all questions "regarding loan status or information we [Fremont] have provided" to Bridge.

24.

Fremont did not perform its underwriting services for the plaintiffs in accord with

its own underwriting guidelines.  The plaintiffs were damaged by this conduct, as they were tricked into accepting two loans that they did not have the ability to repay.

25

Fremont paid Bridge a yield spread premium in connection with the plaintiffs' refinance of their properties.

26.

For approximately six months after the new loans closed, Bridge continued to promise the plaintiffs their new loans, and told them they had begun the process of originating the refinances.  Bridge ordered an appraisal of the plaintiffs' properties in the spring of 2007, but never closed the loans.  By May 2007, Bridge's employees were hanging up on the plaintiffs when they attempted to contact Bridge by phone.  The promised loans never materialized.  The plaintiffs made several calls to Fremont during this period in which they reported and complained about Bridge's fraud in making the transactions; Fremont took no corrective action in response to these complaints.

FIRST CLAIM FOR RELIEF (against Bridge and Fremont) - Fraud

27.

Plaintiffs reallege and incorporate by reference paragraphs 1 through 26.

28.

Bridge made the following false representations to plaintiffs:

A.  That the loans Bridge arranged for them were the best the plaintiffs could qualify for at the time;

B.  That Bridge would replace the loans at no cost in six months with loans that reduced their total monthly mortgage payments by $700.00;

C.  That the new loans arranged by Bridge would include escrow reserves for the payment of taxes and insurance;

D.  That an underwriting department would verify plaintiffs' income, assets, and creditworthiness prior to approving the loan.

E.  In connection with closing, that plaintiffs had the right to cancel the loans within 72 hours of signing.

29.

Defendants additionally made the following false representations and omissions in connection with plaintiffs' loans, and transmitted documents to Fremont that revealed the false representations:

A.  Bridge falsely completed plaintiffs' loan applications by misrepresenting the borrowers' income; the application stated that Justin James earned $6750.00 per month, when he actually earned much less, and had provided Bridge with accurate income information.  Additionally, the numerous applications misrepresented plaintiffs' mortgage indebtedness and payments prior to the refinances.

B.  Bridge and Fremont failed to inform plaintiffs that based upon the income and asset information plaintiffs had supplied, the loans Bridge and Fremont were saddling them with were unaffordable and unsuitable for plaintiffs, and would lead to the plaintiffs' loss of both properties.

C.  Bridge and Fremont knew that the plaintiffs' preexisting mortgages were more favorable to the plaintiffs than the refinances they were defrauded into making.

D.  Bridge and Fremont worked together to manipulate the broker demands to evade HOEPA and still charge plaintiffs the maximum amount of fees allowed.

30.

Defendants knew or should have known that the representations alleged in paragraphs 28 and 29 were false, and made those representations, or omitted to inform plaintiffs of the truth, to induce the plaintiffs to enter into the loan refinance transactions with Bridge and Fremont.

31.

As a result of defendants' false representations, plaintiffs were damaged in the following ways:

A. Plaintiffs entered into two unnecessary refinances that caused them to incur approximately $39,652.00 in closing fees and costs.

B.  Plaintiffs' monthly loan principal and interest payment on their residence increased by approximately $600.00 per month, not including taxes and insurance, when Bridge promised that their loan payment would decrease.  This additional interest, calculated over the life of the loan, is an item of plaintiffs' damages, and will be calculated with more specificity at trial.

C.  Plaintiffs' monthly loan principal and interest payment on their rental property increased by approximately $48.84 per month as well, when Bridge promised that the payment would decrease.  This additional interest, calculated over the life of the loan, is an item of plaintiffs' damages, and will be calculated with more specificity at trial.

D.  Discovering that they had been cheated by the defendants caused the Jameses severe emotional distress in the form of anxiety about whether they would be able to make the new payments, and at the prospect of losing their properties to foreclosure.  Justin James and Nicole James have each been damaged in the amount of $10,000.00, for a total of $20,000.00.

32.

Defendants' misrepresentations to plaintiffs were made with malice; alternatively, defendants have shown a reckless and outrageous indifference to a highly unreasonable risk of harm and have acted with a conscious indifference to the welfare of others, warranting an award of punitive damages to be proven at trial, at a minimum amount of $2,000,000.00.

33.

Fremont is jointly and severally liable for Bridge's fraud because:

A.  Bridge acted as Fremont's agent in the transaction, clothed with either actual or apparent authority.

B.  Fremont acted in concert with Bridge, or pursuant to a common design with it, to defraud the plaintiffs; or gave substantial assistance to Bridge in accomplishing the fraud upon the plaintiffs, while its own conduct, separately considered, constituted a breach of duty to the plaintiffs.

C.  Fremont ratified the fraud after the fact, which was perpetrated for Fremont's benefit.

D.  Bridge and Fremont's combined efforts to make loans to the plaintiffs formed a joint venture that subjected Bridge and Fremont to liability for each other's torts.

SECOND CLAIM FOR RELIEF (against Bridge) - Oregon Mortgage Broker and Banker Statute, ORS 59.840, et seq.

34.

Plaintiffs reallege and incorporate by reference paragraphs 1 through 33.

35.

Defendant Bridge has transacted business as a mortgage banker or mortgage broker by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, in violation of ORS 59.925(a) and (b).

36.

As a result of defendant's violations of ORS 59.925(a) and (b), plaintiffs have suffered an ascertainable loss consisting of the closing costs of approximately

$39,652.00 and additional interest they are committed to pay under the terms of the new loans.

THIRD CLAIM FOR RELIEF (against Fremont and HSBC, partially in recoupment) -

Truth in Lending Act and Home Ownership and Equity Protection Act.

37.

Plaintiffs reallege and incorporate by reference paragraphs 1 through 36.

38.

Fremont's residential loan to plaintiffs is a consumer credit transaction subject to the plaintiffs' right of rescission pursuant to TILA, 15 USC § 1635, and Regulation Z, 12 CFR § 226.23.  Plaintiff's loan on their residence, moreover, qualifies as a covered loan under HOEPA, 15 USC § 1602(aa)(1)(B), because the points and fees charged or equal to or in excess of 8% of the total loan amount.

39.

At the consummation of the refinanced loan transactions, Fremont failed to deliver to each of the plaintiffs all correct material disclosures required by TILA, including special disclosures required by HOEPA, and four accurately dated copies of the Notice of Right to Cancel in a form the plaintiffs could keep, in violation of 12 CFR § 226.15(b).  Additionally, Fremont engaged in "loan splitting" by selling two loans to plaintiffs when they initially requested one.  This violates TILA's "clear and conspicuous" requirement, which is codified as 15 USC § 1632(a); 12 CFR § 226.17(a).

40.

Because plaintiffs' loan on their residence was covered under HOEPA, plaintiffs were entitled to enhanced protections, including a three-day advanced disclosure of the final terms of the loan, 15 § USC 1639, warnings under 15 § USC 1639(a)(1), and a prohibition on pre-payment penalties, 15 § USC 1639(c).

41.

Pursuant to 15 USC §1635(a) and 12 CFR § 226.23(a)(3), the plaintiffs had a continuing right to rescind the residential transaction for up to three years following its consummation, which plaintiffs exercised by sending a letter to Fremont on February 26, 2008, and to HSBC on February 25, 2009.

42.

As a result of the aforesaid violations of TILA and HOEPA, pursuant to 15 USC § 1635(a) and 1640(a), Fremont and HSBC are liable to plaintiffs for:

A.  Actual damages in an amount to be determined at trial, including but not limited to return of any money or property given by the plaintiffs to anyone in connection with this transaction, including all loan fees and costs paid in connection with the loan and all payments made by plaintiffs;

B.  Statutory damages of $12,000.00.

C.  Enhanced damages pursuant to 15 USC § 1604(a)(4) in the amount equal to the sum of all finance charges and fees paid by the plaintiffs in the residential transaction.

D.  Declaratory relief that the pre-payment penalty is invalid;

E.  Reasonable attorney fees and costs.


FOURTH CLAIM FOR RELIEF (Against Fremont)—Negligence

43.

Plaintiffs reallege and incorporate by reference paragraphs 1 through 42.

44.

Fremont requested and received confidential financial information from the plaintiffs, including but not limited to salary information, mortgage indebtedness and

credit scores.  Plaintiffs paid Fremont $2058.00 for the service of providing professional

underwriting assessment, and relied upon Fremont for expert advice about whether

they could afford the loans being offered.  These facts gave rise to a special

relationship between them.

45.

As such, the parties did not engage in an arm's length commercial transaction,

and Fremont had the duty to properly evaluate plaintiff's suitability for the loan products.

46.

Fremont breached its duty by selling two loans to the plaintiffs that were

substantially more expensive than their previous loans, that Fremont knew the

borrowers could not afford.

47.

Plaintiffs' damages, as detailed below, were the direct and proximate cause of

granting loans that stripped a significant amount of their equity and had no chance of

being repaid.

48.

As of the result of its negligence, Fremont is liable for:

A. $39,652.00 in closing fees and costs stemming from these unnecessary

refinances.

B.  Plaintiffs' monthly loan principal and interest payment on their residence

increased by approximately $600.00 per month, not including taxes and insurance,

when Bridge promised that their loan payment would decrease.  This additional interest,

calculated over the life of the loan, is an item of plaintiffs' damages, and will be

calculated with more specificity at trial.

C.  Plaintiffs' monthly loan principal and interest payment on their rental property

increased by approximately $48.84 per month as well, when Bridge promised that the

payment would decrease.  This additional interest, calculated over the life of the loan, is an item of plaintiffs' damages, and will be calculated with more specificity at trial.

D.  Discovering that they had been cheated by the defendants caused the Jameses severe emotional distress in the form of anxiety about whether they would be able to make the new payments, and at the prospect of losing their properties to foreclosure.  Justin James and Nicole James have each been damaged in the amount of $10,000.00, for a total of $20,000.00.

49.

Fremont acted with reckless and outrageous indifference to a highly unreasonable risk of harm, warranting an award of punitive damages to be proven at trial, at a minimum amount of $2,000,000.00.


FIFTH CLAIM FOR RELIEF (against Fremont)—Breach of Contract

50.

Plaintiffs reallege and incorporate by reference paragraphs 1 through 49.

51.

Plaintiffs paid $2058 to Fremont for underwriting services.  Said underwriting services included a fair evaluation of whether plaintiffs could afford to pay the loan products offered by Fremont.

52.

Fremont breached this contract by failing to perform the services in a commercially reasonable manner.

53.

As the result of this breach of contract, Fremont is liable for damages, including

A.  $2058 that was paid in consideration of the underwriting services.

B.  Consequential damages, including the $39,652 spent by the Jameses for

unnecessary loan fees and additional interest, calculated over the life of the loan, which will be calculated with more specificity at trial.

SIXTH CAUSE OF ACTION (against Bridge and Fremont, in recoupment)—Real Estate Settlement Procedure Act.

54.

Plaintiffs reallege and incorporate by reference paragraphs 1 through 53.

55.

The Real Estate Settlement Procedures Act ("RESPA), 12  USC  § 2607 (b) prohibits the charging of excessive, unearned and duplicative fees.

56.

In violation of RESPA, defendants charged the following unearned and/or duplicative fees.

A.  Multiple credit reports for loans settled on the same day in the amount of $14.

B.  A last minute "loan setup fee" in the amount of $100 that was only charged for one loan and was inserted into the fees for the rental home only after fees were deducted from the residential mortgage in an effort to avoid HOEPA.

C.  A $150 appraisal fee for unnecessary and unrequested expedited services.

57.

As the result of these violations of RESPA, the plaintiffs are entitled to:

A. Any actual damages that are proven at trial

B.  Three times the amount paid for these settlement services in the amount of $792.  12 USC § 2614.

B.  Reasonable attorney's fees and costs.

58.

PRAYER FOR RELIEF:

WHEREFORE, plaintiffs pray for:

1.  On their first claim for relief (Fraud):

    A.  Actual damages in an amount to be proven at trial;

    B.  Non-economic damages in the amount of $20,000.00;

    C.  Punitive damages in the amount of at least $2,000,000;

    D.  A court order enjoining the defendants from foreclosing upon the properties secured by the loans.

2.  On their second claim for relief (ORS 59.925):

    A.  Actual damages in an amount to be proven at trial;

    B.  Attorneys fees pursuant to ORS 59.925(8);

    C.  A court order enjoining the defendants from foreclosing upon the properties secured by the loans;

    D.  Punitive damages of at least $2,000,000;

    E.  Reasonable costs of the action.

3.  On their third claim for relief (TILA and HOEPA):

    A.  Actual damages in an amount to be proven at trial, including but not limited to plaintiffs' closing costs and all payments made on the loan, together with prejudgment interest;

    B.  Statutory damages under TILA of $12,000.00;

    C.  Attorneys fees pursuant to 15 USC § 1640(a)(3);

    D.  A court order declaring valid the plaintiffs' exercise of rescission under the Truth in Lending Act, and enjoining the defendants from foreclosing upon the property secured by the residential loan;

    E.  Enhanced damages pursuant to 15 USC § 1604(a)(4) in the amount

equal to the sum of all finance charges and fees paid by the plaintiffs in the residential transaction;

F.  Declaratory relief that the pre-payment penalty is unenforceable;

G.  Reasonable costs of the action.

4.  On the fourth claim for relief (Negligence)

A.  Actual damages in an amount to be proven at trial;

B.  Non-economic damages in the amount of $20,000.00;

C.  Punitive damages in the amount of at least $2,000,000.

5.  On the fifth claim for relief (Breach of Contract)

A.  $2058 that was paid in consideration of the underwriting services;

B.  Consequential damages of at least $39,652.

6.  On the sixth claim for relief (RESPA)

A.  Actual damages in an amount to be proven at trial;

B.  Statutory damages of $792.00;

C.  Reasonable attorney's fees and costs.


JURY DEMAND:

59.

Plaintiffs hereby demand trial by jury.

DATED this 14th day of January, 2010.

Respectfully submitted,

OREGON LAW CENTER


By:/s/ Hope A. Del Carlo
Hope A. Del Carlo, OSB No. 00241
921 SW Washington St., Suite 516
Portland, OR 97205
Telephone: 503/473-8319
Facsimile: 503/295-0676

hdelcarlo@oregonlawcenter.org

GRIFFIN AND McCANDLISH
  Mark E. Griffin, OSB No. 76152

  R. Bradley Griffin, OSB No. 07239
  Griffin & McCandlish
  215 SW Washington St, Suite 202
  Portland, OR 97202
  mark@markgriffin.com
  Telephone: (503) 224-2348
  Facsimile:  (503) 224-3634

  Of Attorneys for Plaintiffs