IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


JUSTIN JAMES and NICOLE                    08-CV-397-BR
JAMES,

          Plaintiffs,                      OPINION AND ORDER

v.

BRIDGE CAPITAL CORPORATION, a
California Corporation;
SIGNATURE GROUP HOLDINGS,
INC., f/k/a Fremont
Reorganizing Corporation and
Fremont Investment & Loan
Company; and HSBC BANK USA,
NA, a national banking
association,

          Defendants.



HOPE A. DEL CARLO
Oregon Law Center
921 S.W. Washington Street, Suite 516
Portland, OR 97205
(503) 473-8319
MARK E. GRIFFIN

1 - OPINION AND ORDER

Griffin & McCandlish
215 S.W. Washington Street, Suite 202
Portland, OR 97204
(503) 224-2348

**MATTHEW ALLEN BRINEGAR**
Center for Responsible Lending
910 17th St. N.W., Suite 500
Washington, DC 20006
(202) 349-1888

      Attorneys for Plaintiffs

**DAVID S. AMAN**
Tonkon Torp LLP
888 S.W. Fifth Avenue,Suite 1600
Portland, OR 97204-2099
(503) 802-2053

      Attorneys for Defendant Signature Group Holdings, Inc.

**JOHN M. THOMAS**
**LANCE E. OLSEN**
Routh Crabtree Olsen, PC
11830 S.W. Kerr Parkway, Suite 385
Lake Oswego, OR 97035
(503) 517-7180

      Attorneys for Defendant HSBC Bank USA, NA


**BROWN, Judge.**

    This matter comes before the Court on Defendant HSBC Bank USA's Motion (#64) for Summary Judgment and Defendant Signature Group Holdings, Inc.'s Motion (#65) for Summary Judgment.  For the reasons that follow, the Court **GRANTS in part** and **DENIES in part** HSBC's Motion for Summary Judgment and SGH's Motion for Summary Judgment.


2 - OPINION AND ORDER

## PROCEDURAL BACKGROUND

On March 27, 2008, Plaintiffs filed their original Complaint against Defendants Signature Group Holdings (formerly Fremont Reorganizing Corporation and Fremont Investment and Loan Company) and Bridge Capital Corporation.  On May 30, 2008, SGH filed a timely Answer, but Bridge failed to enter a timely appearance. Accordingly, on June 18, 2008, the Court granted Plaintiffs' Motion for Default against Bridge.

On March 13, 2009, Plaintiffs filed a First Amended Complaint in which Plaintiffs named SGH and Bridge as Defendants and added HSBC Bank USA as a defendant.  SGH filed a timely response, but HSBC did not.

On June 8, 2009, the Court granted Plaintiffs' Motion for Entry of Default against HSBC.  On July 17, 2009, however, HSBC sought relief from the Default, which the Court granted on July 20, 2009.

Plaintiffs assert six claims in their Amended Complaint: (1) against Bridge and SGH for actual damages, emotional distress, punitive damages, and injunctive relief arising from common-law fraud; (2) against Bridge for actual and punitive damages, injunctive relief, and attorneys' fees and costs arising from violation of Oregon Revised Statute § 59.840; (3) against SGH and HSBC for actual damages, statutory damages, enhanced statutory damages, declaratory relief, rescission, and attorneys'

fees and costs arising from violations of the Truth in Lending
Act (TILA), 15 U.S.C. § 1601, *et seq.*, and its corollary, the
Home Ownership and Equity Protection Act (HOEPA), 15 U.S.C.
§§ 1601-1667f; (4) against SGH for actual, noneconomic, and
punitive damages arising from common-law negligence; (5) against
SGH for actual and consequential damages arising from breach of
contract; and (6) against SGH and HSBC for actual and
consequential damages, attorneys' fees, and costs arising from
violations of the Real Estate Settlement Procedure Act (RESPA),
12 U.S.C. § 2601, *et seq*.

HSBC filed its Motion for Summary Judgment on April 30,
2010, and SGH filed its Motion for Summary Judgment on May 3,
2010.  In their Response to Defendants' Motions for Summary
Judgment, Plaintiffs state:

> Plaintiffs have communicated to the
> defendants their withdrawal of the claims for
> damages for origination violations under
> RESPA and TILA/HOEPA.  These claims are
> subject to one-year statutes of limitation,
> and were raised in recoupment of HSBC's
> efforts to collect the debt secured by the
> plaintiffs' Residence by foreclosure.  The
> foreclosure is not currently pending;
> plaintiffs reserve the right to renew these
> claims if HSBC restarts the foreclosure.

On August 25, 2010, the Court heard oral argument on the Motions.
At oral argument Plaintiffs repeated their withdrawals set out in
their Response.  Plaintiffs, therefore, do not pursue their Sixth
Claim under RESPA or claims for damages under their Third Claim

4 - OPINION AND ORDER

related to loan-origination documents, including a claim
Plaintiffs referred to as "recoupment."  To the extent Defendants
move for summary judgment as to those claims, therefore,
Defendants' Motions are moot.

The Court heard continuing oral argument on September 22,
2010.  During that portion of the oral argument, the Court
granted SGH's Motion for Summary Judgment as to Plaintiffs'
Fourth Claim for negligence.  The Court ordered Plaintiffs to
file supplemental briefs with respect to Plaintiffs' remaining
common-law claims against SGH for fraud and breach of contract.

Thus, Plaintiffs' remaining claims against which Defendants
SGH and HSBC move for summary judgment are:  First Claim for
common-law fraud against SGH, Third Claim pursuant to TILA and
HOEPA for rescission against SGH and HSBC,[1] and Fifth Claim for
breach of contract against SGH.


## FACTUAL BACKGROUND

The following facts are taken from the parties' Concise
Statements of Material Facts and their respective Responses and

---

[1] At oral argument on August 25, 2010, Plaintiffs asserted
an action for damages against Defendants SGH and HSBC for failure
to honor Plaintiffs' notice of rescission.  Defendants did not
specifically move for summary judgment against such a claim, and
it is not clear from the face of the Amended Complaint whether
Plaintiff has actually pled such a claim.  In any event, the
Court will not address the merits of that claim at this stage of
the proceedings because that issue is not currently before the
Court.

are undisputed unless otherwise noted.

Plaintiffs own two homes near the Oregon coast:  a residence in Neotsu, Oregon (Residence) that is Plaintiffs' principal dwelling and a rental home in Lincoln City, Oregon (Rental).  In September 2006, despite their desire to refinance their Rental home only, Plaintiffs were convinced by an employee of Bridge, the California mortgage broker that Plaintiffs hired to help obtain financing, to refinance the mortgages on both properties separately.  Plaintiff ultimately accepted two separate refinance loans:  the Residence for $259,000 and the Rental for $178,000. Plaintiffs assert they agreed to obtain these two separate loans based on assurances by an employee of Bridge that they would only have to pay on these loans for six months at which time their credit would be improved enough for Bridge to offer them loans on better terms.  The promised second refinancing never materialized despite Plaintiffs' requests to rework the loans after closing.

Defendants admit Bridge made a number of false statements about the loans, including statements that Plaintiffs would save money with the loans and that there would be reserves for taxes and insurance.  Plaintiffs admit they were aware before they executed the loan documents that the refinanced loans were less favorable to Plaintiffs than their prior mortgages; for example, the interest rate for the Rental was originally fixed at 5.95% and was refinanced to an adjustable rate mortgage of 10.95% with

a balloon payment of $165,400 at maturity.  In addition, the refinancing led to an increase in Plaintiffs' monthly payments and cost them nearly $40,000 in fees while providing them with less than $20,000 in cash.  The combined monthly payments on the two refinanced loans ultimately exceeded Plaintiffs' monthly income.

During Plaintiffs' application process, Bridge and SGH (then Fremont) operated under a Wholesale Brokerage Agreement whereby Bridge would act as the agent of prospective borrowers and submit loan applications to SGH for approval.  Under the Brokerage Agreement, Bridge was required to furnish to SGH information such as credit reports of its prospective borrowers, to explain to borrowers the loan terms, and to answer borrowers' questions about the loan-origination process.  In performing these tasks, Bridge was required to meet SGH's standards, which included providing accurate information to SGH.  Bridge submitted Plaintiffs' loan applications to SGH, and SGH underwrote and approved the loans based on those applications.

Before closing on the loans, Plaintiffs did not make any contact with SGH or its employees.  In their Response to SGH's Concise Statement of Material Facts, Plaintiffs acknowledge they had not heard of SGH before the loans closed.  SGH asserts, and Plaintiffs do not dispute, that SGH was not at any time before closing made aware of Plaintiffs' concerns with the terms of the

loans nor Bridge's promise to refinance the loans in six months. Plaintiffs first contacted SGH about one week after closing in September 2006 concerning the money that Plaintiffs were to receive as a part of the loan transaction.  Plaintiffs dispute SGH's assertion that when Plaintiffs contacted SGH in September 2006, they did not raise the issue of Bridge's promise to work out a second refinance of the loans after six months.  Justin James, however, testified Plaintiffs first made SGH aware of these matters in approximately July 2007.

Plaintiffs assert Bridge and SGH shifted loan fees from Plaintiffs' Residence loan to their Rental loan during the refinance process in order to avoid the application of HOEPA to Plaintiff's Residence loan.  SGH acknowledges it discussed several different broker demands with Bridge before reaching an agreement as to the terms of the loans, but SGH denies it unlawfully manipulated any fees.

SGH charged underwriting fees in connection with processing Plaintiffs' loans and accepted personal and financial information from Plaintiffs in connection with its review of the loan applications sent to them by Bridge on Plaintiffs' behalf. Defendants admit Bridge made false and inconsistent entries on loan applications, including the amount of Plaintiffs' income despite the fact that Plaintiffs provided W-2 tax forms, pay stubs, and information about their existing mortgages, insurance,

and 401(k).  SGH denies it knew such information was false at the time of its review of the loan applications.

At closing on September 15, 2006, Plaintiffs were given unsigned and undated copies of the loan documents and were provided with Notices of Right to Cancel that had the wrong closing date and did not reflect the expiration of Plaintiffs' right to cancel.  The origination documents also did not include HOEPA disclosures and violated TILA by reflecting inconsistent disclosures of the annual percentage rate, the amount financed, the finance charge, and the total payments.  At closing Plaintiffs expressed reservations about the terms of the loans, particularly concerning the monthly payments and interest rates that were higher than previously stated by Bridge.  In fact, Plaintiffs contacted Bridge during the closing process, and Bridge repeated its instruction to Plaintiffs that they should use the cash they would receive as a part of the transaction to pay the loans for six months at which point Bridge would secure a new loan that would save Plaintiffs approximately $700 per month. Plaintiffs accepted the terms and executed both loans.

HSBC was not involved in the origination of either loan. Both of Plaintiffs' loans were securitized and sold to HSBC on November 3, 2006.  SGH continued to service the loans after the sale until June 1, 2008, when Litton Loan Servicing LP assumed that role.

Plaintiffs defaulted on both loans and have not made payments on either loan for over three years.  Plaintiffs sent letters of intent to exercise their right to rescission to SGH on February 26, 2008, and to HSBC on February 25, 2009.  Neither letter has been honored by SGH or HSBC.

Although HSBC began foreclosure proceedings, it has halted those efforts during the pendency of this litigation.  Plaintiffs remain in possession of both properties, but they assert this dispute led to the loss of renters.

## STANDARDS

**I.    Summary Judgment.**

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. *Id*.

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th

10 - OPINION AND ORDER

Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Id.*  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as amended by* 410 F.3d 1052, 1055 (9th Cir. 2005)(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id.*

## II.  TILA.

TILA is a consumer-protection law that was enacted in 1968 and was designed to ensure that consumers are able to make informed choices with respect to their use of credit. *See* 15 U.S.C. § 1601(a). As a consumer-protection statute, TILA is liberally construed in favor of consumers and is strictly enforced against creditors. *Rubio v. Capital One Bank*, 613 F.3d 1195, 1202 (9th Cir. 2010). TILA requires creditors to make certain disclosures to borrowers, and the failure to do so gives the borrowers certain rights to rescind the loan transaction and to make claims for damages. 15 U.S.C. §§ 1635, 1640.[2] Actions for damages under § 1640 are subject to a one-year statute of limitations. 15 U.S.C. § 1640(e). With respect to the rescission remedy, a borrower who has secured a loan with his primary residence has the right to rescind the transaction until midnight on the third business day following the consummation of the transaction or from the date of delivery of the forms required by TILA. 15 U.S.C. § 1635(a). "[N]otwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor," a borrower's rescission remedy expires after three years from the date of the transaction. 15 U.S.C. § 1635(f).

---

[2]  TILA and HOEPA are implemented by Regulation Z, 12 C.F.R. §§ 226.1, *et seq.*, which is promulgated by the Board of Governors of the Federal Reserve.

## III. HOEPA.

HOEPA was enacted as an amendment to TILA to require additional special disclosures such as the Annual Percentage Rate and the amount of monthly payments for a loan when creditors offer loans with high interest rates or excessive fees.  15 U.S.C. § 1639.  *See also In re Community Bank of N. Va.*, 622 F.3d 275, 282-83 (3d Cir. 2010).  HOEPA only applies to loans secured by a borrower's primary residence in which either the interest rate exceeds a certain threshold or the fees and costs exceed eight percent of the total loan amount.  *See* 15 U.S.C. §§ 1602(aa)(1), (3); 12 C.F.R. § 226.32.

## DEFENDANT HSBC's MOTION FOR SUMMARY JUDGMENT (#64)

HSBC moves for summary judgment as to Plaintiffs' Third Claim on the following grounds:  (1) TILA and HOEPA do not provide for rescission of Plaintiffs' loan to refinance their Rental, (2) Plaintiffs' claims for damages under TILA and HOEPA are barred by the applicable statute of limitations, (3) HSBC is not liable for any HOEPA violations because SGH did not provide HSBC with notice of HOEPA's application to the Residence loan, and (4) Plaintiffs are not entitled to rescission of the Residence loan because they cannot meet their obligation to tender the loan proceeds.

I.   **Rescission of the Rental Loan under TILA and HOEPA.**

The parties do not dispute the remedies of rescission available under TILA and HOEPA are inapplicable to the loan to refinance Plaintiffs' Rental because that loan is not secured by Plaintiffs' "principal residence."  *See* 15 U.S.C. §§ 1602(aa)(1), 1635.  Because Plaintiffs conceded at oral argument that TILA and HOEPA do not apply to the Rental loan, the Court **grants** that portion of HSBC's Motion.

II.  **Statute of Limitations for Damages Claims against HSBC under TILA and HOEPA.**

In their Third Claim, Plaintiffs seek damages, attorneys' fees, and costs from Defendants for violations of TILA and HOEPA. As noted, Plaintiffs withdrew their damages claims under TILA and HOEPA related to the loan-origination documents.

HSBC contends Plaintiff's claim against HSBC for damages arising out of the assignment of the loans from SGH are barred by the statute of limitations.  As noted, HSBC was assigned the loans on November 3, 2006, and Plaintiffs filed this action on March 27, 2008, which was beyond the one-year statute of limitations set out in § 1640(e).  Thus, Plaintiffs' claims for damages against HSBC under TILA and HOEPA arising out the assignment of the loans from SGH to HSBC are time-barred. Accordingly, the Court **grants** that portion of HSBC's Motion.

Plaintiffs also assert a claim for damages against SGH and

14 - OPINION AND ORDER

HSBC for failing to give effect to Plaintiffs' notice of their intent to exercise their rights to rescission under TILA and HOEPA as set out in their letters to HSBC on February 25, 2009, and to SGH on February 26, 2008. HSBC stated at oral argument on August 25, 2010, that it had not moved for summary judgment against such a claim and, therefore, was not prepared to address that claim. Although Plaintiff's Complaint does not expressly state such a claim, Plaintiffs' Amended Complaint sufficiently put HSBC on notice of such a claim under §§ 1635 and 1640. *See Miguel v. Country Funding Corp.*, 309 F.3d 1161, 1165 (9th Cir. 2002)(recognizing a "failure-to-effect-rescission claim" for damages under §§ 1635 and 1640). In any event, this claim is not before the Court at this time.

**III. Limitations on HSBC's Liability for HOEPA Violations.**

HSBC contends as an assignee it is not liable to Plaintiffs under HOEPA because the loan originator (SGH) did not include a notice to the assignee (HSBC) that the loan is covered by HOEPA. HSBC cites § 1641, which provides: "Any person who sells or otherwise assigns a mortgage referred to in section 1602(aa) of this title shall include a prominent notice of the potential liability under this subsection as determined by the Board." *See also* 12 C.F.R. § 226.34(a)(2)(same). Neither the statute nor the regulation, however, condition an assignee's liability on receipt of such a notice.

15 - OPINION AND ORDER

Although Plaintiff did not respond directly to HSBC's argument and the parties do not dispute that SGH did not include HOEPA notices with the loans, the Court cannot find any authority for the proposition that the failure of assignor SGH to provide the proper HOEPA notice to its assignee HSBC undermines the rights of Plaintiffs against the assignee.  In fact, the statute makes clear that a plaintiff's rescission rights against an assignee are coextensive with its rights against the original lender.  15 U.S.C. § 1641(c).  Section 1641(d)(1), however, provides the following limitation on an assignee's liability:

> Any person who purchases or is otherwise
> assigned a mortgage referred to in section
> 1602(aa) of this title shall be subject to
> all claims and defenses with respect to that
> mortgage that the consumer could assert
> against the creditor of the mortgage, unless
> the purchaser or assignee demonstrates, by a
> preponderance of the evidence, that a
> reasonable person exercising ordinary due
> diligence, could not determine, based on the
> documentation required by this subchapter,
> the itemization of the amount financed, and
> other disclosure of disbursements that the
> mortgage was a mortgage referred to in
> section 1602(aa) of this title.

In light of the requirement that the Court interpret TILA and HOEPA broadly to further the goal of protecting consumers from predatory lending tactics, the Court concludes the failure by an assignor of a loan to provide an assignee with notice that the loan is covered by HOEPA does not affect the rights of the borrower against the assignee for HOEPA violations.  In

16 - OPINION AND ORDER

accordance with § 1641(d)(1), the assignee is limited to a defense "that a reasonable person exercising ordinary due diligence, could not determine, based on the documentation required by this subchapter, the itemization of the amount financed, and other disclosure of disbursements that the mortgage was a mortgage referred to in section 1602(aa) of this title." Nevertheless, § 1641(d)(4) may affect the rights between the assignor and assignee and may, for example, provide the assignee with a claim against the assignor who failed to provide proper notice in order to recoup damages paid to a borrower for HOEPA violations.

Thus, to the extent that HOEPA applies to Plaintiffs' Residence loan, the Court concludes SGH's failure to provide notice to HSBC of HOEPA's application to the assigned Residence loan in compliance with § 1641 does not foreclose Plaintiffs' claims for HOEPA violations against HSBC. Accordingly, the Court **denies** that portion of HSBC's Motion.

## IV. Rescission of the Residence Loan under TILA and HOEPA.

Although HSBC does not challenge the merits of Plaintiffs' claim for rescission of their Residence loan, HSBC maintains the remedy of rescission is not available to Plaintiffs because they would not be able to tender the loan proceeds if the Court ordered a rescission. *See* 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23. *See also Am. Mortg. Network, Inc. v. Shelton*, 486 F.3d

17 - OPINION AND ORDER

815, 821 (4th Cir. 2007)(affirmed grant of summary judgment in favor of defendant on plaintiff's TILA claims on the ground that after "the trial judge . . . determined that [plaintiffs] were unable to tender the loan proceed, the remedy of unconditional rescission was inappropriate.").

Here HSBC maintains Plaintiffs could not satisfy their obligation to return the loan proceeds within the 20-day time frame set out in § 1635(b) and in 12 C.F.R. § 226.23. At his deposition, Justin James testified Plaintiffs could not immediately tender the loan proceeds and would need 20-30 years to repay the loan amount on a payment plan. Justin James stated, in fact, that Plaintiffs could not tender *any* of the loan proceeds at the time of his deposition. Justin James later clarified in his deposition that Plaintiffs would be willing to get a loan to repay the amount if their credit were restored as a part of this litigation. In any event, Plaintiffs contend they have presented enough evidence on this record to establish an issue of fact exists as to their ability to tender the loan proceeds.

Although the record is thin, it appears on this record that Plaintiffs would likely not be able to immediately tender the loan proceeds if the Court were to determine rescission is appropriate. Section 1635(b) provides:

> When an obligor exercises his right to
> rescind under subsection (a) of this section,

18 - OPINION AND ORDER

he is not liable for any finance or other
charge, and any security interest given by
the obligor, including any such interest
arising by operation of law, becomes void
upon such a rescission.  Within 20 days after
receipt of a notice of rescission, the
creditor shall return to the obligor any
money or property given as earnest money,
downpayment, or otherwise, and shall take any
action necessary or appropriate to reflect
the termination of any security interest
created under the transaction.  If the
creditor has delivered any property to the
obligor, the obligor may retain possession of
it.  Upon the performance of the creditor's
obligations under this section, the obligor
shall tender the property to the creditor,
except that if return of the property in kind
would be impracticable or inequitable, the
obligor shall tender its reasonable value.
Tender shall be made at the location of the
property or at the residence of the obligor,
at the option of the obligor.  If the
creditor does not take possession of the
property within 20 days after tender by the
obligor, ownership of the property vests in
the obligor without obligation on his part to
pay for it.  The procedures prescribed by
this subsection shall apply except when
otherwise ordered by a court.

Although the statute requires the lender to perform its tender

with 20 days of the notice of rescission, no such time

requirement is placed on tender by the borrower.  Furthermore,

the statute provides the Court may alter the procedures in

§ 1635(b).

The Ninth Circuit has held when the trial court determines

the debtor cannot meet its obligation to tender the loan

proceeds, it is within the court's equitable discretion to

decline to proceed to trial on the issue of rescission.  *Yamamoto*

19 - OPINION AND ORDER

*v. Bank of N.Y.,* 329 F.3d 1167, 1171-73 (9th Cir. 2003).  The
Ninth Circuit explained the court's equitable discretion should
be exercised in light of "the equities present in a particular
case, as well as consideration of the legislative policy of full
disclosure that underlies the Truth in Lending Act and the
remedial-penal nature of the private enforcement provisions of
the Act."  *Id.* at 1171 (quoting *Palmer v. Wilson*, 502 F.2d 860,
862-63 (9th Cir. 1974)).  Thus, a court also has the discretion
to alter the process for tender in accordance with the equities
of a particular case.  *Yamamoto*, 329 F.3d at 1171-72.  *See also*
*Semar v. Platte Valley Fed. Savings & Loan Ass'n,* 791 F.2d 699,
705-06 (9th Cir. 1986).  A court's decision to determine the
borrower's ability to tender on summary judgment or following a
jury verdict that rescission is warranted is to be made on a
case-by-case basis.  *Yamamoto*, 329 F.3d at 1173.

In their Notice of Supplemental Authority, Plaintiffs cite
*Coleman v. Crossroads Lending Group, Inc.*, 09-CV-0221 (PJS/FLN),
2010 WL 4676984 (D. Minn. Nov. 9, 2010), a decision by the United
States District Court for the District of Minnesota in which the
court determined after a trial to the court that the plaintiff
was entitled to rescission.  The court then exercised its
equitable discretion to hold a hearing for the purpose of
fashioning a rescission remedy that would allow the lender to
maintain the security interest in the plaintiff's residence and

20 - OPINION AND ORDER

require the plaintiff to repay the loan proceeds in monthly installments. *Id., at* *6-10.

HSBC, however, points out that *Coleman* is not binding precedent and urges the Court to rely solely on the Ninth Circuit's opinion in *Yamamoto*. Moreover, HSBC contends the facts in *Colemen* are distinguishable from the facts in this matter. The Court, however, notes several important similarities: In *Coleman* the plaintiff accepted a refinancing loan that contained terms that were worse than the terms of her existing mortgage on her home based on the mortgage broker's assurances that it would refinance the loan after the plaintiff had made a series of payments under the new loan. *Id.*, at *1-2. On the day of closing, the plaintiff discovered the monthly payments on the refinanced loan were more than had been promised. *Id.* The court concluded there were violations of the applicable disclosure rules. *Id.* Moreover, the lender in did not independently verify the income of the plaintiff to ensure it was sufficient to allow the plaintiff to make the monthly payments. *Id.*, at *1. The plaintiff in *Coleman* made only two monthly payments, and the promised refinancing never materialized. *Id.,* at *1-2. Thus, although it is not binding authority, the Court finds the decision in *Coleman* persuasive in light of the factual similarities to this matter.

Ultimately the Court must weigh the equities in this case to

21 - OPINION AND ORDER

determine whether Plaintiffs' stated inability to tender the
Residence loan proceeds should, at this stage of the proceedings,
foreclose Plaintiffs' pursuit of the remedy of rescission.  As
noted, Defendants have admitted for purposes of this Motion only
that defaulted Defendant Bridge made material misrepresentations
both to Plaintiffs and to SGH, that Bridge repeatedly and falsely
assured Plaintiffs that it would refinance the loans after
Plaintiffs made payments for six months, and that the terms of
the Residence and Rental loans were much less favorable to
Plaintiffs than the terms of Plaintiffs' prior mortgages on those
properties.

As noted earlier, this record is thin, and it appears likely
Plaintiffs would not be able to tender immediately the loan
proceeds if the Court were to determine rescission is
appropriate.  In light of the purpose of the statutes to protect
consumers from predatory lending tactics, however, the Court
declines under these circumstances to foreclose Plaintiffs'
pursuit of the remedy of rescission at this time.  Accordingly,
the Court, in the exercise of its equitable discretion, **declines
to rule** on this portion of HSBC's Motion and **defers** determination
of Plaintiffs' ability to tender the Residence loan proceeds.  If
this Court or a jury should conclude at a later stage of these
proceedings that Plaintiffs are entitled to rescind their
Residence loan under TILA or HOEPA, it will then be necessary to

22 - OPINION AND ORDER

determine whether Plaintiffs are able to meet their tender
obligation in a manner that satisfies the requirements of the
statutes.


**DEFENDANT SGH'S MOTION FOR SUMMARY JUDGMENT (#65)**

SGH moves for summary judgment as to Plaintiffs' First,
Third, and Fifth Claims.  SGH's Motion as to Plaintiffs' Third
Claim under TILA and HOEPA is based on three of the same grounds
as HSBC's Motion: (1) TILA and HOEPA do not provide a remedy of
rescission for Plaintiffs' Rental loan, (2) Plaintiffs' claims
under TILA and HOEPA for damages relating to the loan-origination
documentation are time-barred, and (3) Plaintiffs are not
entitled to the remedy of rescission because they cannot tender
the loan proceeds.  These are the same arguments made by HSBC and
relate to SGH in the same way.  The Court has already resolved
these issues and, therefore, need not revisit them.

The remaining grounds for summary judgment asserted by SGH
are:  (1) Plaintiffs cannot seek rescission against SGH under
TILA or HOEPA because it has assigned the mortgage on Plaintiffs'
Residence to HSBC, (2) Plaintiffs' Residence loan is not subject
to HOEPA, (3) Plaintiffs have failed to show a genuine issue of
material fact exists as to the formation of a contract between
Plaintiffs and SGH for underwriting, and (4) Plaintiffs have
failed to show a genuine issue of material fact exists as to any

23 - OPINION AND ORDER

of Plaintiffs' remaining four bases for seeking damages arising from SGH's alleged fraudulent acts.  HSBC joins in SGH's Motion with respect to Plaintiffs' TILA and HOEPA claims.

**I.  Rescission against an Assignor of a Mortgage.**

As with HSBC, SGH does not challenge the substantive bases provided by Plaintiffs as to why they are entitled to rescission (*e.g.,* notice deficiencies).  SGH, however, contends Plaintiffs cannot seek rescission against SGH because it has assigned Plaintiffs' loans to HSBC.  SGH cites *Zakarian v. Option One Mortgage Company* in which the District Court for the District of Hawai'i held:

> Plaintiff argues that she can seek rescission from "any or all of the assignees," regardless of whether they are the current holder of the loan. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 3.)  Plaintiff seemingly misunderstands the legal ramifications of an assignment by insisting that Defendant was the current owner of the First Mortgage when the complaint was filed on July 18, 2008.
>
> * * *
>
> An assignment is a "transfer or setting over of property, or of some right or interest therein, from one person to another[.]" Alexander M. Burrill, *A Treatise on the Law and Practice of Voluntary Assignments for the Benefit of Creditors* § 1 at 1 (James Avery Webb ed., 6th ed. 1894).  Once a valid and unqualified assignment is made, all interests and rights of the assignor are transferred to the assignee; the assignor loses all control over the thing assigned, and cannot do anything to defeat the assignee's rights. *See* 6A *C.J.S. Assignments* § 112, p. 1158.

24 – OPINION AND ORDER

> In this case, Option One assigned its
> interests and rights in the First Mortgage to
> Wells Fargo.  As such, it may no longer
> assert dominion over the assigned loan.  By
> the mere fact of the assignment, the assignor
> impliedly guarantees or agrees that he or she
> will not thereafter interfere with the thing
> assigned, or do anything to defeat or impair
> the value of the assignment.  *See Lonsdale v.
> Chesterfield*, 99 Wash. 2d 353, 662 P.2d 385
> (1983).  Indeed, any act of dominion by the
> assignor over the thing assigned, depriving
> the assignee of title or right to possession,
> is a conversion for which the assignor may be
> held liable in tort.  6A *C.J.S. Assignments*
> § 112, p. 1158.  Option One, therefore, lacks
> the authority to grant a rescission of the
> loan or affect any of Wells Fargo's rights or
> interests to the assignment.

642 F. Supp. 2d 1206, 1213 (D. Haw. 2009).  At oral argument on

August 25, 2010, Plaintiffs' counsel stated they are "not seeking

for [SGH] to release the security interest," which renders this

portion of SGH's Motion **moot**.

Plaintiffs, however, also stated at oral argument that they

maintain their rescission claim against SGH for return of the

fees and interest collected by SGH as part of the Residence loan

transaction.  In response, SGH contended such a claim is merely a

disguised claim for damages, which would be barred by the statute

of limitations.  The Court, however, declines to characterize

Plaintiffs' claim as such.

Section 1635(b) provides for the creditor to return "any

money or property" to the obligor.  The Court, therefore, **denies**

SGH's Motion to the extent that SGH seeks summary judgment as to

25 - OPINION AND ORDER

that portion of Plaintiffs' Third Claim for rescission of the
Residence loan in which Plaintiffs request a return of the fees
collected by SGH as a part of the loan transaction; that is "any
money or property given as earnest money, downpayment, or
otherwise." *See* 15 U.S.C. § 1635(b).

## II. Application of HOEPA to Plaintiffs' Residence Loan.

SGH contends HOEPA does not apply to Plaintiffs' Residence
loan, and, therefore, SGH did not provide HOEPA documentation to
Plaintiffs.  HOEPA only applies to a special class of high-cost
loans secured by a borrower's primary residence that have either
high interest rates (exceeds the Treasury securities rate by 8%)
or excessive fees and costs (that total more than 8% of the total
loan).  12 C.F.R. § 226.32(a).  Although the parties agree the
interest rate of Plaintiffs' Residence loan does not exceed the
HOEPA threshold, Plaintiffs contend their Residence loan fees and
costs exceed 8% of the total loan.

In their Response and in Hope Del Carlo's Declaration in
support of their Response, Plaintiffs contend the total fees,
points, and costs charged at closing on the Residence loan,
which, according to Plaintiffs, includes a "Yield Spread Premium"
(YSP) of $2,590, exceeds 8% of the loan.

SGH challenges Plaintiffs' calculation of the points and
fees due at closing on the sole ground that Plaintiffs overstate
the total of points and fees because Plaintiffs were not charged

26 - OPINION AND ORDER

a YSP nor did they pay a YSP.  According to SGH, without the YSP that is erroneously included in Plaintiffs' calculations, the "total points and fees payable by [Plaintiffs] at or before closing" do not exceed 8% of the total Residence loan.  *See* 15 U.S.C. § 1602(aa)(B)(i).  SGH offers the Supplemental Declaration of Irma Valdez, Ombudsman Manager of SGH, who attests a YSP was not included on the "Broker Demand" form, which controlled the fees and points at closing.  Moreover, Valdez also attests Plaintiffs were not charged and did not pay a YSP.  Although Plaintiffs point to a HUD-1 document included in the closing documents that shows a YSP of $2,590, SGH points to the HUD-1 document created after the loan closed that reflects the actual fees and points due at closing.  Valdez acknowledges the original HUD-1 included a YSP, but she attests the document was subsequently amended and Plaintiffs were not charged a YSP.

Nevertheless, Plaintiffs contend the HUD-1 they signed at closing is sufficient to create an issue of fact.  Plaintiffs, however, do not identify any evidence in the record that reflects they actually paid the YSP as a part of the Residence loan and could not at oral argument point to any evidence in the record other than the original HUD-1.  Thus, the Court does not have a basis to disregard Valdez's sworn statement, which is supported by copies of the Broker Demand and amended HUD-1 that do not reflect a YSP.  The Court, therefore, concludes the actual fees

27 - OPINION AND ORDER

and costs on the loan did not exceed 8% of the total Residence loan, and, accordingly, the heightened protections of HOEPA were not triggered.  15 U.S.C. § 1602(aa)(B).  Thus, the Court **grants** SGH's Motion as to Plaintiffs' Third Claim to the extent Plaintiffs' seek relief under HOEPA with respect to Plaintiffs' Residence loan.

Although Plaintiffs make a number of additional arguments with respect to the numerous versions of the Broker Demand and the HUD-1 documents that Bridge and SGH created before deciding the final points and fees with respect to Plaintiffs' loans and also contend Bridge and SGH shifted points and fees from the Residence loan to the Rental loan to avoid the application of HOEPA to the Residence loan, Plaintiffs have not provided any legal basis under federal law or HOEPA that indicate such actions are unlawful or are to be considered when determining whether HOEPA applies to Plaintiffs' Residence loan.  The Court, however, will consider these facts as they relate to SGH's Motion for Summary Judgment against Plaintiffs' First Claim for common-law fraud.

**III. Breach of Contract.**

In their Fifth Claim, Plaintiffs contend SGH breached their contract to provide underwriting services to Plaintiffs by failing to underwrite the loan in accordance with SGH's own policies.

28 - OPINION AND ORDER

SGH moves for summary judgment as to Plaintiffs' Fifth Claim for breach of contract on the following grounds:  (1) Plaintiffs have not shown a genuine issue of material fact exists as to the formation of a contract between SGH and Plaintiffs for underwriting services on the loans and (2) Plaintiffs have not shown a genuine issue of material fact exists as to SGH's breach of the purported contract.

SGH acknowledges Plaintiffs paid $2,036 for underwriting services and that SGH performed the underwriting.  Moreover, it is undisputed that the Brokerage Agreement between Bridge and SGH contained the following underwriting provision:

> ***Underwriting.***  Notwithstanding any other provision of this Agreement to the contrary, the decision whether any Loan shall be approved for funding, and the terms of such Loan, shall be the sole responsibility, and at the sole discretion of, Lender.  Lender will, by written notification, approve or decline each loan application submitted to it for consideration.  Each Loan Application Package shall be underwritten by Lender in accordance with the then-current guidelines as they pertain to the loan program requested.  Lender shall have no obligation, express or implied, to fund any loan which is not approved in writing by Lender.  Broker shall be responsible for informing each loan applicant of the matters set forth in this paragraph.

**A.    Contract Formation.**

As noted, Plaintiffs assert they entered into a contract with SGH under which SGH was obligated to perform underwriting services in accord with its "then-current guidelines."

29 - OPINION AND ORDER

Plaintiffs rely on the following to support their position:
(1) the Brokerage Agreement under which Bridge was the agent and
representative of the loan applicant and was responsible for
"informing each loan applicant of the matters set forth in" the
underwriting provision; (2) the HUD-1 document enclosed with and
referenced in the loan documents that included the statement "UW
to Fremont [SGH]"; and (3) the Real Estate Settlement Procedure
Act (RESPA), 12 U.S.C. § 2601, *et seq.*, which requires lenders to
perform underwriting services when borrowers pay for such
services.  Plaintiffs allege on these grounds that SGH promised
Plaintiffs, through their agent Bridge, to underwrite their loans
in accordance with SGH's internal guidelines in exchange for
$2,036.

SGH, in turn, contends it did not contract with Plaintiffs
to underwrite their loans and asserts the HUD-1 form is a mere
formality required by TILA rather than a contract between
Plaintiffs and SGH.  *See, e.g., Cornelius v. Fidelity Nat'l Title
Co.*, No. C08-754 MJP, 2009 WL 596585 (W.D. Wash. Mar. 9, 2009).
Although Plaintiffs concede a HUD-1 form is not necessarily a
contract, they assert the HUD-1 disclosure is evidence of the
agreement that demonstrates Plaintiffs paid for underwriting
services by SGH.  Plaintiffs also contend documents referenced in
a contract, such as the HUD-1 disclosure, become a part of the
contract under Oregon law, and, therefore, the fact that the

HUD-1 disclosure was included with the closing documents for the two loans means it is incorporated into those real-estate loan agreements. *See Cerino v. Oregon Physicians' Svcs.*, 276 P.2d 397, 483 (Or. 1954). *See also Restatement (Second) Contracts* § 132 (comment).

SGH also notes Plaintiffs conceded their RESPA claim, and, therefore, that statute does not provide Plaintiffs with a common-law contract claim. Although Plaintiffs concede this point, they maintain RESPA's prohibitions against unearned fees require that services paid for by the borrower must actually be performed by the lender. *See* 12 U.S.C. § 2607. It may not be determinative of the issue of formation, but, nevertheless, the fact that federal law requires lenders to perform the services paid for by borrowers lends credence to Plaintiffs' argument that SGH agreed to perform the services paid for by Plaintiffs.

Ultimately SGH does not identify any legal authority that categorically establishes there was not a contract between SGH and Plaintiffs for underwriting services. Thus, the formation question comes down to a question of intent; *i.e.*, whether the parties intended to form a contract for underwriting services by SGH in exchange for Plaintiffs' $2,036 consideration. *See Tolbert v. First Nat'l Bank,* 312 Or. 485, 494 (1991).

Viewing the facts in the light most favorable to Plaintiffs, a rational juror could conclude that SGH offered its underwriting

31 - OPINION AND ORDER

services to Plaintiffs (through Bridge as their agent) and that Plaintiffs accepted SGH's offer by paying valuable consideration for that service.

**B.   Breach.**

Plaintiffs allege SGH breached the contract by ignoring its own underwriting policies in three ways:  (1) SGH did not underwrite the Residence and Rental loans together, which skewed SGH's debt-to-income analysis in favor of authorizing loans that would have otherwise exceeded SGH's standards (50-54% debt-to-income ratio) if the loans had been underwritten together; (2) SGH did not include the taxes and insurance in its debt-to income analysis, which would have further increased the debt-to-income ratio to nearly 70% of Plaintiffs' stated income; and (3) SGH failed to adequately investigate the accuracy of Plaintiffs' stated income, which would have demonstrated the loans were not affordable for Plaintiffs because their actual income ($3,850 per month) was far less than the "stated income" of $6,750.  *See* Del Carlo Decl., Ex. D.

SGH does not address these contentions directly even though it generally disputes Plaintiffs' characterization of SGH's underwriting policies.  Instead SGH contends even if a contract was formed, SGH's could not breach such a contract by failing to follow its own underwriting policies because those policies were only created for SGH's benefit and not for the benefit of loan-

applicants such as the Plaintiffs.  To support its position, SGH cites *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, a California Court of Appeals case in which the court held a bank's failure to follow its internal deposit guidelines did not give rise to a negligence claim.  49 Cal.App. 4th 472, 481-82 (1996).  *Software Design*, however, concerns the imposition of a duty on a bank pursuant to California negligence law in the absence of a contract and is plainly distinguishable on that ground.  SGH also cites a recent decision from this District by Judge Michael R. Hogan in which Judge Hogan held a lender did not owe a fiduciary obligation to a borrower based on the longstanding Oregon rule of law that lenders and borrowers act at arm's length.  *Hogan v. NW Trust Servs., Inc.* No. 10-6027-HO, 2010 WL 1872990, at *9 (D. Or. May 7, 2010).  Thus, both of SGH's cited cases are rooted in negligence law and do not foreclose a contract claim such as the one advanced by Plaintiffs.

Viewing the facts in the light most favorable to Plaintiffs, the Court concludes genuine issues of material fact exist as to whether SGH breached its contract with Plaintiffs by failing to follow its "then-current guidelines" when it performed the underwriting on Plaintiffs' Residence and Rental refinance loans submitted by Bridge.  Accordingly, the Court **denies** SGH's Motion with respect to Plaintiff's Fifth Claim for breach of contract.

**IV.  Fraud.**

In their First Claim for common-law fraud against Bridge and SGH, Plaintiffs contend Bridge made the following misrepresentations to Plaintiffs:  (1) the loans that Bridge arranged for Plaintiffs were the best they could qualify for at that time; (2) Bridge would replace the refinanced Residence and Rental loans at no cost after Plaintiffs made six months of payments on the loans; (3) the replacement loans would save Plaintiffs $700 per month; (4) the Residence and Rental loans would include escrow reserves to pay taxes and insurance; (5) Plaintiffs' approval was subject to an underwriting process that would verify Plaintiffs' income, assets, and creditworthiness; (6) Plaintiffs had the right to cancel the loans within 72 hours of closing; and (7) Bridge falsely reported Plaintiffs' monthly income and indebtedness on the loan applications to SGH.  SGH does not dispute these statements.

Plaintiffs acknowledge they did not speak to SGH before the loans closed on September 15, 2006, and Plaintiffs do not assert SGH made misrepresentations directly to them.  Plaintiffs, however, contend SGH is vicariously responsible for Bridge's fraudulent statements because (1) Bridge acted as an agent of SGH, (2) SGH aided and abetted Bridge's fraud against Plaintiffs, (3) SGH ratified Bridge's fraudulent conduct, and (4) SGH is liable for Bridge's fraud as a partner in a joint venture.  SGH

34 - OPINION AND ORDER

moves for summary judgment as to Plaintiffs' First Claim for fraud against SGH.

**A.   Agency.**

Plaintiffs contend SGH is liable for Bridge's fraud on the basis of both actual and apparent agency.

**1.   Actual Agency.**

The parties agree Oregon law requires mutual assent between Bridge and SGH to create an actual agency relationship. *See Hampton Tree Farms, Inc. v. Jewett,* 320 Or. 599, 617 (1995). Although the parties agree it is not necessarily legally controlling, the Brokerage Agreement between Bridge and SGH expressly disclaimed an agency relationship:

> ***Agency***.  When performing its obligations under this Agreement, except as may be construed with respect to obtaining appraisals under paragraph 5 hereof, Lender and Broker agree that Broker is neither an agent nor an employee of Lender and may not be construed as such by reason of this Agreement.  Broker shall be deemed to be acting as an independent contractor and agent and representative of the loan applicant, and not of Lender.  Broker is hereby expressly prohibited from holding itself out as an agent, representative or employee of Lender or as having any endorsement from or affiliation with Lender.  Broker shall have no authority to sign on behalf of Lender or to commit Lender in any manner whatsoever to fund Loans.  This Agreement shall not be deemed to appoint Broker as attorney-in-fact of Lender or create any power of attorney in Broker.  Broker shall not make express or implied representations or warranties to loan applications that conflict with the authority

35 - OPINION AND ORDER

> set forth in this Agreement.  Broker is
> specifically prohibited from using Lender's
> name in any form of advertising without
> Lender's prior written consent.  Lender is
> acknowledged not to be the agent or the loan
> applicant, but represents solely the Lender
> in all Loan transactions.  Broker shall
> obtain the acknowledgment from each borrower
> that Lender is not the agent of the borrower.
> There shall be no partnership, franchise,
> joint venture, agency or any other
> association between Lender and Broker.

Nonetheless, Plaintiffs contend an issue of fact exists as to whether an agency relationship existed between Bridge and SGH on the basis of SGH's delegation of authority to Bridge. Plaintiffs note the Brokerage Agreement obligated Bridge to perform a multitude of specific tasks on SGH's "behalf," such as gathering information from and communicating with loan applicants.  The Brokerage Agreement requires these tasks to be performed subject to SGH's guidelines, inspection, and approval. Plaintiffs also point out that SGH retained ultimate control over underwriting and funding.

SGH, however, contends the Brokerage Agreement is evidence of SGH's intent that Bridge would act solely as the agent of the borrower and not as SGH's agent.  Moreover, the Brokerage Agreement merely requires Bridge to gather information from the potential borrowers and to fill out the loan applications on behalf of applicants for SGH's consideration in the manner that SGH prescribed.  The Brokerage Agreement sets out Bridge's duties as follows:

36 - OPINION AND ORDER

***Broker's Submission Responsibilities***.  As the exclusive and only agent of the Borrower in the loan transaction, and not as the agent of Lender, Broker shall take and complete loan application packages, including credit verifications, obtain appraisals, and all other information and documentation required by Lender ("Loan Application Package'') for submission to Lender.  Broker shall perform other duties for its borrower-clients, not on behalf of Lender, as required by law, including, but not limited to:  collecting financial information; ordering requests for mortgage rating; ordering verifications of employment and deposits; counseling its borrower-clients about the loan process, alternatives to financing, selecting a lender, the risks and merits of mortgage borrowing and the meaning of loan documents; communicating with loan applicants; ordering legal documents; ordering inspections and engineering reports; and delivering Broker's disclosures and other material information. Each Loan Application Package, and Broker's activities hereunder, shall be subject to, and shall comply with the terms and conditions of this Agreement and Lender's Loan Submission Guidelines (the "Guidelines'), as the same may be amended from time to time.

The Brokerage Agreement also provides the relationship between Bridge and SGH was not an exclusive one, and Bridge was free to apply for loans with other lenders.

Despite Plaintiffs' characterization that Bridge performed these duties on "behalf" of SGH, the Brokerage Agreement makes clear SGH intended Bridge to perform these tasks on behalf of the loan applicants in their efforts to submit a loan application for SGH's consideration.  This provision is merely a description of SGH's requirements to consider a loan

37 - OPINION AND ORDER

application from Bridge and does not give Bridge the authority to act on SGH's behalf.  In fact, in the Brokerage Agreement SGH disclaims any authority by Bridge to bind SGH.

In addition to the Brokerage Agreement, Plaintiffs rely heavily on SGH's letters to Plaintiffs.  On August 23, 2010, SGH advised Plaintiffs by letter that their loan application was being processed, and SGH provided the initial TILA disclosures. The letter included the following statement:  "In order that we may process your application more quickly, we ask that you consult with your loan broker Bridge Capital Corporation [phone number omitted] with questions regarding loan status or the information provided."  The letter does not indicate SGH gave Bridge the authority to act as SGH's agent or to speak on behalf of SGH, but merely evinces SGH's desire that questions about the loan status or the TILA disclosures should be directed through Bridge, Plaintiffs' broker.  Furthermore, the scope of SGH's statement is only that Plaintiffs should consult with Bridge about the loan status or the information provided in the disclosure forms attached to the letter.  None of the evidence presented by Plaintiffs gives rise to a reasonable inference that SGH instructed or directed Bridge to defraud Plaintiffs or gave Bridge the authority to do so on its behalf.  Accordingly, the Court **grants** SGH's Motion with respect to Plaintiffs' First Claim for fraud based on actual agency between SGH and Bridge.

38 - OPINION AND ORDER

2.    **Apparent Agency.**

The only conduct at issue with respect to apparent agency is whether SGH acted as the principal in any way that would create the appearance of an agency relationship.  *See Checkley v. Boyd*, 198 Or. App. 110, 134 (2005)("Apparent authority 'can be created only by some conduct of the principal [that], when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter.  The third party must also rely on that belief.'")(quoting *Jones v. Nunley*, 274 Or. 591, 595 (1976)).

As noted, in their Response to SGH's Concise Statement of Material Facts, Plaintiffs admit they had not heard of SGH before the loans closed.  In their Response, however, Plaintiffs rely almost exclusively on SGH's letter to Plaintiffs dated August 23, 2010, to establish that SGH's conduct gave rise to Plaintiffs' reasonable belief that Bridge was an agent of SGH. In any event, SGH states in the final sentence on page one of the letter that Plaintiffs should "consult with your loan broker Bridge Capital Corporation [phone number omitted] with questions regarding loan status or the information provided."  This statement, however, is insufficient standing alone to give rise to an issue of fact as to apparent agency.  The letter refers to Bridge as "your [Plaintiffs'] loan broker."  Moreover, SGH states

in its letter that "your broker has chosen us for your lending needs," which demonstrates Bridge made a selection among lenders and was not exclusively providing loans through SGH.  Although Justin James testified at his deposition that he believed Bridge was "working for" SGH, his testimony makes clear that his belief was not based on any action or conduct by SGH.  In fact, Justin James stated he believed Bridge was working for SGH based on his comparison of the Defendants' relationship to the one between "Jerry Iverson" and "Wells Fargo" and did not indicate his belief was based on SGH's conduct.  On this record, Plaintiffs could not have based their belief on SGH's conduct if they were, admittedly, unaware of SGH before closing.  In addition, Justin James testified he understood Bridge was working on Plaintiffs' behalf as their mortgage broker and that SGH considered Bridge to be Plaintiffs' broker based on the August 23, 2010, letter from SGH.

SGH also contends there is not any genuine issue of material fact as to whether Bridge had apparent agency because Plaintiffs do not provide any evidence that Plaintiffs relied on any conduct by SGH.  Although Plaintiffs assert the fact that SGH did not make direct contact with Plaintiffs (*i.e.*, SGH's "absence of conduct") somehow gave rise to Plaintiffs' "reasonable" belief that Bridge was SGH's agent, SGH's August 23, 2010, letter sent directly to Plaintiffs undermines that argument.  In addition,

40 - OPINION AND ORDER

toward the end of SGH's letter, SGH informed Plaintiffs: "If you have any questions about the servicing of you loan, please call us at our toll free number [omitted] from 6:00 AM to 6:00 PM (Pacific Time) Monday through Friday." The invitation to communicate directly with SGH and the provision of contact information for SGH also undermines Plaintiffs' contention that they were directed to speak only to Bridge about the loans.

In summary, the Court concludes on this record that none of the evidence presented by Plaintiffs gives rise to a reasonable inference that SGH consented to have Bridge act as its actual agent or that SGH's conduct gave rise to a reasonable belief by Plaintiffs that Bridge was SGH's apparent agent. Accordingly, the Court **grants** SGH's Motion with respect to Plaintiffs' First Claim for fraud based on apparent agency between SGH and Bridge.

**B.    Aiding and Abetting.**

Plaintiffs also contend SGH is liable for Bridge's fraud because Bridge and SGH worked in concert to defraud Plaintiffs. Under Oregon law one can be liable for the tortious conduct of another if one either joins in the act or substantially assists or encourages the other in the commission of a tort. *Granewich v. Harding*, 329 Or. 47, 53 (1999). When adopting § 876 of the *Restatement (Second) of Torts*, the Oregon Supreme Court set out three bases for holding a party liable for another's tort:

> (a) does a tortious act in concert with the
> other or pursuant to a common design with

him, or

(b) knows that the other's conduct
constitutes a breach of duty and gives
substantial assistance or encouragement to
the other so to conduct himself, or

(c) gives substantial assistance to the other
in accomplishing a tortious result and his
own conduct, separately considered,
constitutes a breach of duty to the third
person.

*Id.* at 53-54.  Plaintiffs assert SGH is liable for the tortious

conduct of Bridge under (a) and (b).

As noted, SGH admits for purposes of this Motion only that

Bridge made material misrepresentations to Plaintiffs, but SGH

maintains it was not aware of such statements while processing

Plaintiffs' two loan applications.

### 1.    In Concert.

Plaintiffs assert three grounds to support their

contention that SGH acted in concert with Bridge to commit fraud

against Plaintiffs:  (1) Bridge sent SGH numerous Broker Demands

to maximize Bridge's fees and to avoid application of HOEPA to

Plaintiffs' Residence loan, (2) SGH approved interest-rate

variances on Plaintiffs' loans of .05% for the Residence loan and

.10% for the Rental loan, and (3) SGH knew there was little

benefit for Plaintiffs in the loans because Plaintiffs' equity of

more than $40,000 yielded only $19,000 in cash from the

refinanced loans.

As noted, Plaintiffs have not provided any authority that

42 - OPINION AND ORDER

shifting fees from one loan to another to avoid the application of HOEPA or that a lender's efforts to avoid a high-cost loan by keeping the fees and interest rates below a certain level are unlawful.  In fact, Plaintiffs concede in their Supplemental Memorandum on Fraud that the manipulation of fees, costs, and interest rates to maximize profits "might not rise to the level of tortious conduct," and Plaintiffs have not shown that a lender's efforts to maximize profits by means of fees for services legitimately offered or by approval of interest-rate variances constitutes tortious conduct.

In addition, SGH maintains the negotiation over fees and costs were between Bridge and Plaintiffs and that Bridge merely submitted its broker demands to SGH as the numbers changed. Moreover, SGH contends it did not have any knowledge of the substance of the communications between Bridge and Plaintiffs and did not know what negotiations were taking place between them. Plaintiffs do not identify any evidence in the record to the contrary.

On this record the Court concludes there is not a genuine issue of material fact as to whether SGH committed a tortious act in concert with Bridge by adjusting fees in the broker demand, assigning a variance in the interest rates, or approving a loan that ultimately paid Plaintiffs in cash roughly half of the equity they had in their Residence and Rental.

43 - OPINION AND ORDER

Accordingly, the Court **grants** SGH's Motion with respect to
Plaintiffs' First Claim for fraud based on Plaintiffs' claim that
SGH acted in concert with Bridge.

      **2.    Substantial Assistance.**

      Plaintiffs also contend SGH knew Bridge was the agent
of Plaintiffs and was aware that Bridge was manipulating the fees
and interest rates to the ultimate end of taking roughly $20,000
of Plaintiffs' equity for itself.  Under long-standing Oregon
law, Bridge, as the agent of Plaintiffs, owes a duty of care,
*inter alia*, to Plaintiffs, its principals, that includes acting
to further the economic interests of the principal.  *See Loosli
v. City of Salem*, 215 Or. App. 502, 508 (2007).   Plaintiffs
contend SGH's participation in making a loan that put Bridge's
self-interest over the interests of Plaintiffs makes SGH liable
for the breach of the duties that Bridge owed to Plaintiffs.
Plaintiffs point to Exhibit D, which includes the numerous Broker
Demands and shows SGH was aware that Plaintiffs' loan benefit
"cash out" began at $46,000.  Thus, Plaintiffs assert SGH knew
Bridge was breaching its duty as agent to Plaintiffs and SGH
participated in and benefitted from that breach.

      SGH contends it was not aware of the nature of the
agreement between Bridge and Plaintiffs.  In its Brokerage
Agreement and in its August 23, 2010, letter to Plaintiffs,
however, SGH acknowledges Bridge was the agent of Plaintiffs.  In

44 - OPINION AND ORDER

any event, SGH asserts this is the first time that Plaintiffs
have raised the argument that SGH knew Bridge was breaching its
duty to Plaintiffs as their agent and participated in and
benefitted from that breach, but the Court notes Plaintiffs
assert in their Response to the Motions for Summary Judgment that
SGH assisted Bridge in breaching its duties to Plaintiffs to
SGH's benefit. *See* Pls.' Resp. (#77) at 29-30.

On this record, Plaintiffs have shown a genuine issue
of material fact exists as to whether SGH knowingly gave Bridge
substantial assistance in breaching Bridge's duty of care to
Plaintiffs, its principals, by accepting Bridge's loan requests
in which SGH played a role in raising the broker fees that
ultimately diminished Plaintiffs' "cash out" value from the
transaction by almost $25,000 to the benefit of Bridge and
approved higher interest-rate variances for both loans.
Accordingly, the Court **denies** SGH's Motion with respect to
Plaintiffs' First Claim for fraud based on Plaintiffs' claim that
SGH substantially assisted Bridge in breaching its duties owed to
Plaintiffs.

### C. Ratification.

Plaintiffs also contend even if SGH did not actively aid in
Bridge's fraud, SGH is liable because it ratified the fraudulent
conduct by Bridge.  The Oregon Court of Appeals explained
ratification under Oregon law in *Checkley v. Boyd*:

45 - OPINION AND ORDER

> Ratification requires that the principal have
> "knowledge of the material facts and the
> intent to ratify" the unauthorized acts of
> the purported agent. *Paragano v. Gray*, 126
> Or.App. 670, 677, 870 P.2d 837 (1994)
> (citations omitted).  The necessary intent to
> ratify a purported agent's acts can be
> inferred from a failure to repudiate or
> disavow them.  *Id*. at 678, 870 P.2d 837. But
> a principal's inaction or silence can provide
> a basis to affirm the unauthorized act of a
> purported agent only under "'such circum-
> stances that, according to the ordinary
> experience and habits of men, one would
> naturally be expected to speak if he did not
> consent [.']"  *Kneeland v. Shroyer*, 214 Or.
> 67, 94, 328 P.2d 753 (1958)(quoting with
> approval *Restatement (First) of Agency* § 94
> comment a (1933)).

198 Or. App. at 135-36.  Oregon law has long held those who

"countenance the commission of a tort by another, or who approve

of it after it is done, if done for their benefit, are liable in

the same manner as they would be if they had done the same tort

with their own hands."  *Perkins v. McCullough*, 36 Or. 146, 49-50

(1899).  Plaintiffs contend SGH ratified Bridge's fraudulent

conduct when Plaintiffs informed SGH of the fraud committed by

Bridge and SGH failed to investigate those claims or repudiate

the agreement.

SGH contends it was unaware of any of Bridge's alleged fraud

before the loans closed and that it had to be aware of all

material facts in order to "ratify" Bridge's conduct.  *See*

*Checkley*, 198 Or. App. at 136.  Plaintiffs do not point to any

evidence to the contrary.  Thus, to the extent that Plaintiffs

46 - OPINION AND ORDER

contend SGH ratified Bridge's fraudulent conduct as of the date
the loans closed, the Court does not find any genuine issue of
material fact exists.

Plaintiffs, however, also contend SGH ratified Bridge's
fraudulent conduct when Justin James contacted SGH in the week
following closing to find out why Plaintiffs had not received the
"cash out" money from the loan transaction.  Justin James
admitted at his deposition that he did not raise the issue of
Bridge's misrepresentations to Plaintiffs at that time.
Ultimately SGH provided Plaintiffs with the money that was due,
and Plaintiffs did not contact SGH again for roughly nine months.
The record does not reflect SGH was aware of Bridge's fraud at
the time of Justin James's September 2006 telephone call to SGH,
and Plaintiffs do not identify any evidence in the record
sufficient to raise a reasonable inference that SGH intended to
ratify Bridge's conduct at that point.

SGH also maintains the only information it received about
Bridge's alleged fraud was nine months after the loan had been
approved in July 2007.  SGH, however, had assigned Plaintiffs'
loans to HSBC on November 3, 2006, and asserts it was not,
therefore, in a position to assist Plaintiffs and could not have
ratified Bridge's conduct to its own benefit at that point.  The
Court, however, finds SGH's response is inadequate.  It is
undisputed that Plaintiffs told SGH in July 2007 about Bridge's

47 - OPINION AND ORDER

fraud in the origination of the two loans at issue.  SGH,
however, failed to repudiate or to disavow the loans or even to
investigate the nature of Plaintiffs' claims at that time.  Thus,
SGH retained the benefit of the loan, which included the fees and
interest it had received as well as the value of the loans it
obtained when it assigned them to HSBC.

On this record, the Court concludes a genuine issue of
material fact exists as to whether SGH ratified the fraudulent
conduct of Bridge in July 2007 when Plaintiffs notified SGH of
Bridge's conduct during and after closing and, in spite of that
information, failed to repudiate or to disavow the loan
transactions.  Accordingly, the Court **grants** SGH's Motion with
respect to Plaintiff's First Claim for fraud based on Plaintiff's
claim that SGH ratified Bridge's fraudulent conduct before July
2007 and **denies** SGH's Motion with respect to Plaintiff's claim
that SGH ratified Bridge's fraud during or after July 2007.

**D.    Joint Venture.**

Plaintiffs originally brought a claim in which they
contended Bridge and SGH formed a joint venture to originate
Plaintiffs' loans, which would make each Defendant liable for the
torts committed by the other.  At the hearing on September 22,
2010, the Court directed Plaintiffs to file a supplemental
memorandum setting out the legal elements for each of Plaintiffs'
fraud theories in the nature of a jury instruction and to

48 - OPINION AND ORDER

identify the evidence in the existing record that supports each element.  Plaintiffs, however, did not do so with respect to their joint-venture theory.  The Court, therefore, considers Plaintiffs' failure to do so a concession of that claim, and SGH's Motion is, therefore, **granted** to that extent.

## CONCLUSION

For these reasons, the Court makes the following rulings:

Based on the record and oral argument on September 22, 2010, the Court issued an Order (#99) on September 23, 2010, granting Defendant SGH's Motion (#65) for Summary Judgment with respect to Plaintiff's Fourth Claim for negligence.  In addition, based on Plaintiffs' withdrawals in their pleadings and at oral argument, the Court **DENIES as moot** Defendants' Motions (#64, #65) for Summary Judgment as to Plaintiffs' Sixth Claim under RESPA and Third Claim for damages under TILA and HOEPA related to the loan-origination documents.  Based on Plaintiffs' concessions in their pleadings and at oral argument, the Court **GRANTS** Defendants' Motions (#64, #65) as to Plaintiffs' Third Claim for damages or rescission under TILA and HOEPA with respect to Plaintiffs' Rental loan and First Claim for fraud against SGH based on a joint venture between SGH and Bridge.

With respect to the parties' remaining grounds for summary judgment, the Court **GRANTS in part** and **DENIES in part** HSBC's

49 - OPINION AND ORDER

Motion (#64) for Summary Judgment with respect to Plaintiffs'
Third Claim as follows:

    1.   **GRANTS** HSBC's Motion as to Plaintiffs' Third Claim
under TILA and HOEPA to the extent that Plaintiffs seek damages
or attorneys' fees against HSBC arising out the assignment of the
Rental or Residence loans because such claims are time-barred;

    2.   **DENIES** HSBC's Motion to the extent that HSBC seeks to
invalidate any HOEPA claims brought by Plaintiffs against HSBC
based on HSBC's contention that SGH did not provide HSBC with
notice that Plaintiffs' loans were covered by HOEPA; and

    3.   **DECLINES to rule** and **DEFERS** resolution of HSBC's Motion
as to Plaintiffs' Third Claim for rescission under TILA to the
extent that HSBC seeks summary judgment on the ground that
Plaintiffs have not shown they are able to meet their tender
obligation.

    The Court also **GRANTS in part** and **DENIES in part** SGH's
Motion (#65) for Summary Judgment as follows:

    1.   As to Plaintiffs' Third Claim under TILA and HOEPA, the
Court:

                a.   **DECLINES to rule** and **DEFERS** resolution of SGH's
                   Motion to the extent that SGH seeks summary
                   judgment on the ground that Plaintiffs have not
                   shown they are able to meet their tender
                   obligation;

50 - OPINION AND ORDER

b.    **DENIES as moot** SGH's Motion to the extent that Plaintiffs seek rescission of the Residence loan against SGH for a release of the security interest in Plaintiffs' Residence because Plaintiffs stated they are not seeking such a claim against SGH; and

c.    **DENIES** SGH's Motion to the extent that Plaintiffs seek rescission against SGH for return of the money collected by SGH from Plaintiffs as part of the Residence loan transaction.

2.    As to Plaintiffs' Fifth Claim for breach of contract, the Court **DENIES** SGH's Motion because genuine issues of material fact exist.

3.    As to Plaintiffs' First Claim for fraud against SGH, the Court

a.    **DENIES** SGH's Motion to the extent that Plaintiffs seek to hold SGH liable for Bridge's fraud on the ground that SGH substantially assisted Bridge in breaching the duty Bridge owed to its principals, Plaintiffs;

b.    **DENIES** SGH's Motion to the extent that Plaintiffs seek to hold SGH liable for Bridge's fraud on the ground that SGH ratified Bridge's fraudulent conduct against Plaintiffs during or after July 2007; and

      c.    **GRANTS** SGH's Motion with respect to each of the remaining grounds on which Plaintiffs seek to hold SGH liable for Bridge's fraud.

The Court **directs** the parties to file **no later than February 7, 2011,** a joint status report setting out the remaining claims in this matter and proposing a schedule to resolve those claims by trial to a jury or to the Court.

IT IS SO ORDERED.

DATED this 25th day of January, 2011.


/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District Judge

52 - OPINION AND ORDER